UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Cause No. 1:23-CR-9-HAB |
| ) | |
| KELTON ANDERSON ) | |
| ) | |

**OPINION AND ORDER**

Kelton Anderson (Anderson), a suspected drug pusher, is charged with drug and gun offenses in a three-count federal indictment. (ECF No. 1). These charges stemmed from evidence seized following execution of a search warrant at an apartment, alleged to be Anderson's, located on Bridgeway Drive ("the Bridgeway Apt.") in Fort Wayne, Indiana. Anderson now moves to suppress the evidence obtained during the search along with any statements he made following it. (ECF No. 43). He seeks a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978) (ECF No. 44.) In his motions, Anderson challenges the probable cause for issuance of the search warrant and the veracity of the averments by the swearing officer in the search warrant affidavit. The motions are fully briefed (ECF No. 44, 55, and 60), and ripe for consideration. Because the Court finds that Anderson has not met his burden for a hearing under *Franks*, the Motion for a *Franks* Hearing will be DENIED. The Court also finds the probable cause determination of the magistrate to be sound and DENIES the Motion to Suppress.

**SEARCH WARRANT AFFIDAVIT**

On February 9, 2023, Detective and Task Force Officer Darren Compton ("TFO Compton") of the Allen County Police Department (ACPD) obtained a search warrant for the Bridgeway Apt. to search for evidence of drug trafficking activities. (ECF No. 57 at 11). The warrant followed multiple DEA investigations beginning in July 2021 and lasting through the

Defendant's arrest in February 2023. Supporting the request for a search warrant was TFO Compton's affidavit, a ten-page summation of the investigation. (ECF No. 57, at 1-10).

TFO Compton swore that in July 2021, a wiretap investigation conducted by the DEA in Milwaukee, Wisconsin, and South Bend, Indiana, led investigators to "Kelton Anderson's residence" at the Bridgeway Apt. (ECF No. 57, p. 1). Although Anderson was not the main target of the wiretap investigation, TFO Compton and DEA Task Force Officer Peter Mooney ("TFO Mooney") conducted surveillance at the Bridgeway Apt. and observed an unidentified male arrive at the residence, enter it for a brief time, exit the residence and place an item in the trunk under the spare tire. TFO Compton believed this activity to be consistent with discussions in the wiretap investigation that a money pickup would be occurring. TFO Compton also stated "[d]uring that investigation which was corroborated by interviews of suspects, Anderson received 1 to 2 pounds of cocaine from their main target." (*Id.* at 2)

In October and November 2021, the DEA seized a total of $230,000 in two recoveries. Physical and electronic surveillance and interviews which led to the cash seizures pointed to an individual (Individual #1)[1] believed to be a participant and leader in a drug organization. The investigation revealed that Individual #1 was attempting to launder the money seized to the Mexican cartels. Anderson was named as a member of Individual #1's drug trafficking organization (DTO). (ECF No. 57 at 2). In August 2022, 9 months after the cash recoveries, a suspect involved in this fall 2021 investigation told investigators that Anderson was still involved with Individual #1's DTO and dealing narcotics. (*Id.* at 3).

On December 13, 2021, investigators observed a white GMC truck with license plate no. TK345OAE pull into 3121 Edgerton Street ("Edgerton Street address"). Anderson was identified

---

[1] Individual #1 is specifically identified in the unredacted affidavit which the Government filed under seal. For now, the identity of Individual #1 is not necessary to the issues raised in the motions.

2

as the driver of that GMC truck. On January 20, 2022, the same GMC truck was parked in the driveway of the Edgerton Street address. Anderson is seen jogging from the front door of the residence to the truck with one hand partially concealed under his shirt or "held closely to his mid-section." Anderson entered the truck. Individual #1 was observed standing in the doorway of the Edgerton Street address.

In April 2022, TFO Compton and others interviewed a confidential human source (CI #1). CI #1 had been arrested for narcotics violations before and was known to provide credible information in other investigations. CI #1 told investigators that CI #1 purchases narcotics from Anderson, that Anderson lives at the Bridgeway Apt., drives a white truck, and charges $30,000 for a kilogram of cocaine, $2,000 for 50 grams of fentanyl, and $900-$950 for an ounce of cocaine. CI #1 advised that Anderson is "always heavily armed" (ECF No. 57 at 3). CI #1 also identified Individual #1 as Anderson's narcotics supplier.

Investigators interviewed a second confidential human source (CI #2) in September 2022. CI #2 had been arrested for narcotics violations in the past, had been a federal confidential informant, and had provided credible information leading to arrests. (ECF No. 57 at 3). CI #2 stated that Anderson was dealing ounces of cocaine out of his apartment in Lakeshore Apartments. TFO Compton added to the affidavit that the Bridgeway Apt is located in the Lakeshore Apartment complex. (*Id.*).[2] CI #2 stated that Individual #1 was dealing narcotics with Anderson.

On October 11, 2022, task force officers along with the DEA, conducted surveillance at the Bridgeway Apt. They observed Anderson leave the entrance to the Bridgeway Apt. and drive away in the white GMC truck. Investigators followed Anderson to an address on Trace Way ("the Trace Way house") in Fort Wayne, IN. While Anderson was observed parked there, three more

---

[2] This addition by TFO Compton turned out to be wrong as Anderson points out in his offer of proof.

3

vehicles arrived, including a silver SUV which Individual #1 was known to use. Officers positively identified Individual #1 and his son. A black male exited from one of the vehicles and carried a bag into the Trace Way house. While this was ongoing, a male entered Anderson's vehicle on the passenger side and exited a few minutes later. Anderson then left the area driving the white GMC truck. (ECF No. 57 at 3). Through his 22 years of experience in large scale narcotics related crimes, TFO Compton averred that illegal narcotics dealers commonly conduct a money drop at a residence where multiple people drop off money previous drug debts or in anticipation of a new shipment of narcotics. (*Id.* at 4).

Surveillance followed Anderson in the white truck from the Trace Way house and conducted a traffic stop. Anderson was talking on his cell phone when stopped. A K-9 officer used his certified narcotics detection canine to conduct an open air sniff on Anderson's vehicle. After the canine alerted, officers searched the vehicle. Officers located marijuana residue on the floor of the vehicle and in the cup holder. Nothing else of value to the investigation was in the vehicle.

During the traffic stop, surveillance was also taking place at the Trace Way house. Officers observed a male black exit a vehicle parked in the driveway of the Trace Way residence. This individual walked around the complete circular drive in the neighborhood. TFO Compton believes based on his training and experience that the individual was conducting counter-surveillance after Anderson called him telling him he had been stopped. (ECF No. 57 at 4).

On October 14, 2022, Allen Superior Court Magistrate Keirns issued a vehicle tracking warrant for the white GMC truck. The tracker was deployed on the vehicle on October 17, 2022. This tracking warrant was renewed in each subsequent month through January 2023.

Based on the tracking information and physical surveillance, TFO Compton averred that Anderson and the white GMC truck were "making suspicious stops" in parking lots and meeting

individuals for short periods of time. (ECF No. 57 at 5). Again, based on his training and experience, TFO Compton states that it is common for drug dealers to meet with their drug customers and suppliers in parking lots or public places for short time periods. TFO Compton explains that the public meeting spots are so that the drug customers do not know where the drug dealer lives and to prevent their residence from being robbed. (*Id.*).

On November 1, 2022, geolocation data from the vehicle tracking device revealed that Anderson's white truck drove to an apartment complex in Detroit, Michigan, stayed there for 20 minutes, and returned to Indiana. Once in Indiana, K-9 officer Cpl. Ben Fries ("Cpl. Fries") conducted a traffic stop of the truck. Kenneth Menefee ("Menefee") was driving the truck and Anderson was a passenger. When officers approached the vehicle, they smelled the odor of raw marijuana coming from inside the vehicle. Anderson exited the vehicle and Cpl. Fries located marijuana on his person. Menefee admitted that marijuana and money inside the vehicle belonged to him. Both Menefee and Anderson were placed in protective custody inside a patrol car. Anderson refused to consent to a vehicle search.

Cpl. Fries and his canine partner, Django, conducted a free air sniff of the vehicle. Django alerted to the presence of drugs in the vehicle and officers located 12.7 grams of marijuana and $9,000.00 inside it. Menefee told officers that he and Anderson went to Ann Arbor, Michigan to buy a Sprinter Van but once they arrived, he didn't buy it. This information conflicted with the geolocation data which showed the vehicle had gone to Detroit. Menefee and Anderson were transported to the Allen County Police Department, issued summons for possession of marijuana, and released.

On November 29, 2022, Anderson was observed driving the white truck and arriving at a residence on Normandale Drive ("the Normandale Drive residence") in Fort Wayne, Indiana.

While there, a male white subject arrived at the residence and exited a few minutes later carrying something in his hand. The male white subject left the Normandale Drive residence and drove to a gas station where he picked up an individual sitting on the curb. TFO Compton wrote that the individual on the curb "appeared" to have been dropped off there while the white male subject went to meet Anderson. TFO Compton stated that it is common for drug dealers to drop people off before meeting with their supplier so the other person does not know where the drug supply comes from. (ECF No. 57 at 6).

Between October 2022 and January 2023, physical and electronic surveillance showed Anderson going to the Normandale Drive residence multiple times a week where he met with individuals for a short period. Given the comings and goings at the Normandale Drive residence, along with his training and experience, TFO Compton believed the Normandale Drive residence to be a stash house. Investigators also observed Anderson make 11 trips to Orchard Place Apartments[3] with an average duration of 12 minutes spent there and then returning to the Normandale Drive residence. Through TFO Compton's training and experience, Anderson's short trips back and forth suggest he was picking up narcotics at one location and then taking the drugs to another location to distribute them. TFO Compton asserts that this is a common practice of "higher-level narcotics dealers." (ECF No. 57 at 7).

In January 2023, two trash pulls were conducted at the Normandale Drive residence. During both pulls, items consistent with drug trafficking, such as sandwich bags with corners removed, and Ziploc baggies that field tested positive for controlled substances, were found. (ECF No. 57 at 7-8). An insurance card for Toni Covington and mail with a partial name of Alexis were also located, photographed, and placed into evidence storage.

---

[3] There is no information about the Orchard Place Apartments other than Anderson made 11 short trips there between December 6, 2022, and January 2, 2023.

On February 2, 2023, investigators interviewed CI #3 who had been arrested for narcotics charges and provided information that was independently verified. CI #3 told investigators that he had been purchasing cocaine from Anderson at the Bridgeway Apt.[4]

Based on these facts, TFO Compton swore that Anderson has continuously dealt narcotics out of the Bridgeway Apt. since July 2021. Likewise, from the above information, Allen Superior Court Magistrate Judge John Bohdan found probable cause to issue the warrant authorizing the search of both the Bridgeway Apt and the Normandale Drive residence. Defendant's motion challenges only the warrant issued for the Bridgeway Apt.

## DISCUSSION

**A. The *Franks* Standard and Defendant's Offer of Proof**

"The Fourth Amendment's strong preference for the use of search warrants calls for probable cause determinations by a 'neutral and detached magistrate' as opposed to 'officer[s] engaged in the often competitive enterprise of ferreting out crime.'" *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)). "The application for a warrant 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "The ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit." *Id.* "'[A] search warrant is not valid if the police obtain it by deliberately or recklessly presenting false, material information,' or by omitting material information from the affidavit provided to the issuing judge." *Id.* (quoting *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013)).

---

[4] CI #3 reported that he had purchased cocaine from Anderson at an apartment in South Bridge Apartments. The Bridgeway Apt is located in the South Bridge Apartment complex.

7

Ordinarily, a defendant is not entitled to an evidentiary hearing to challenge a facially valid search warrant. But the Supreme Court in *Franks* created a narrow exception to this rule. "'A defendant is entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of information included in a search warrant application—if he can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause.'" *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016). That showing is not limited to false statements but applies to material omissions as well. *Hancock*, 844 F.3d at 708. Merely to obtain a *Franks* hearing, however, a defendant need not prove the *Franks* violation. "Proof by a preponderance of the evidence is not required until the *Franks* hearing itself." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014). But a hearing is not mandated absent "allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. "Reckless disregard for the truth" means that "the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012).

When law enforcement officials submit a search warrant affidavit, it is presumed that the factual showing they make "will be a truthful showing." *Franks*, 438 U.S. at 164-65 (quotation, citation and emphasis omitted). Anderson offers a thorough paragraph by paragraph response to the search warrant affidavit outlining what he believes to be material misstatements or omissions in the affidavit that cast doubt on its veracity. Anderson submits the following as his offer of proof[5]:

---

[5] The Court does not list here all the exhibits the Defendant provided. Other exhibits are referenced as discussed.

8

- a DEA report of investigation dated July 9, 2021, involving information obtained from wiretaps. The report associates Anderson with a phone number 260-255-1818. Two addresses are linked to that telephone number, neither of which is the Bridgeway Apt. address. (ECF No. 47 at 12-13). No DEA report in July 2021 identifies the Bridgeway Apt. as Anderson's apartment. (ECF No. 47 at 14). Anderson contends this information is both omitted from the affidavit and the statement in the affidavit that Anderson's residence is the Bridgeway Apt. is incorrect and intended to mislead the judicial officer.

- a DEA report of investigation dated July 21, 2021, that details surveillance on the Bridgeway Apt. (ECF No. 47 at 17) and photos of the Bridgeway Apt. entrance. Anderson provides this information to refute the statements in the search warrant affidavit that officers saw someone enter the Bridgeway Apt. (ECF No. 47 at 18-19). The report also, according to Anderson, refutes the statement in the affidavit that officers observed a "money pick up." The report indicates only that money was suspected to be the item concealed by the individual seen leaving the Bridgeway Apt. Anderson contends that this information was included to mislead the judicial officer.

- three DEA reports of investigation offered to rebut TFO Compton's averment in the affidavit that in October and November 2021, $230,000 was seized and Anderson was identified in the investigation as part of the DTO from which the $230,000 was seized. (ECF No. 47 at 21-42).

    o The first report, dated August 9, 2022, documents an interview of a person relating to the seizure of $118,070.00 on October 3, 2021, and the seizure of $111,980.00 on November 2, 2021. Anderson is not mentioned in the report. But a recording of the interview, references an individual named "K" who was "playing with the money" and drives a white pickup truck. (ECF No. 62).

    o The second report, dated October 5, 2021, documents the investigation and surveillance that led to the seizure of $118,070.00. Anderson is not referenced in the report.

    o The third report, dated November 3, 2021, documents the seizure of $111,980.00 on November 2, 2021. Anderson is not mentioned in this report.

- a BMV report showing that the white truck registered to Anderson reflects an address for Anderson that is not the Bridgeway Apt. (ECF No. 47 at 43). Anderson asserts that this information is omitted from the affidavit to mislead the judicial officer.

- a DEA report of investigation dated June 9, 2022, that summarizes an interview with CI #1. Anderson asserts that information relating to the reliability and

9

      credibility of the CI was omitted from the affidavit and that the facts presented in the affidavit are not enough to show that CI #1 had the factual knowledge attributed to him in the affidavit.

- a DEA report of investigation dated September 12, 2022, documenting an interview with CI #2 (ECF No. 47 at 50). In that report, CI #2 provides information he received from the CI's girlfriend that Anderson was dealing drugs from his Lakeshore apartment. Anderson rebuts this assertion with a map showing that the Bridgeway Apt is in the South Bridge Apartment Complex. (ECF No. 52).

Apart from the exhibits offered above, Anderson argues that the affidavit omits other critical facts such as the fact that Anderson was patted down at both traffic stops, was not carrying a firearm on either occasion, and no firearms were found in the vehicle at either stop. Anderson asserts that this information, if it had been presented to the magistrate, would have questioned CI #1's statement that Anderson is always heavily armed. Likewise, Anderson believes that the failure of the affidavit to specifically state that Anderson was not involved, observed, or have any part in the cash seizures in the fall of 2021 would have countered the information from CI's that he was affiliated with Individual #1. Finally, Anderson argues that the information in the affidavit relating to the trash pulls do not specify that no mail or other evidence linking Anderson to the Normandale Drive address was located.

Finally, Anderson challenges the factual basis and detail provided by TFO Compton in the affidavit. He asserts that the confidential informant information contained in the affidavit is lacking a proper showing of credibility and that the affidavit is filled with conclusory statements lacking factual support.

## B. Application of Franks Analysis to Anderson's Offer of Proof

The Court begins with the general notion that warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation" *United States v. Ventresca,* 380 U.S. 102, 108 (1965), and so "[a]n affiant cannot be expected to include in an affidavit every piece of

information gathered in the course of an investigation." *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990). Mindful of this fact, the Seventh Circuit has also instructed that the requirement that a search warrant affidavit must not include false statements "does not mean that every fact in the affidavit must turn out to be correct." *United States v. Taylor*, 63 F.4th 637, 649 (7th Cir. 2023).

Anderson has done a laudable job of uncovering mistakes and incorrect information contained in the search warrant affidavit as well as omitted information he believes is material and should have been included. The Government argues that the Defendant's method of isolating pieces of evidence in the affidavit and attacking the sufficiency of each piece of evidence individually ignores the totality of the circumstances analysis that governs the probable cause determination. But this is true only when the question involves the probable cause determination; *Franks* requires a "substantial preliminary showing" of a deliberate intent to include false information or to present information designed to mislead the issuing judge. And that is what Anderson has attempted to do here, although the Court finds he falls short. *See McMurtrey,* 704 F.3d at 509 ("The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses."); *United States v. Green*, 572 F. App'x 438, 442 (6th Cir. 2014) (noting that the "well-settled framework for *Franks* hearings requires a defendant to point to *specific* false statements" and then "accompany his allegations with an offer of proof" (emphasis in original, quotations omitted)).

Anderson attacks many of TFO Compton's conclusions and challenges statements that are his reasonable interpretations of the observed conduct based on his training and experience, rather than actual misstatements. But agents may draw reasonable inferences from their experiences. *See*

11

*generally, Heien v. N. Carolina,* 574 U.S. 54 (2014) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 185 (1990)) ("[W]hat is generally demanded of the many *factual determinations* that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable.") (original emphasis). Further, "a statement in a warrant affidavit is not false merely because it summarizes or characterizes the facts in a particular way." *United States v. Hare*, 772 F.2d 139, 141 (5th Cir. 1985). The Court agrees with the Government that TFO Compton interpreted the facts as they were observed and drew reasonable conclusions based on his training and experience in drug trafficking.

At most, Anderson's offer of proof has highlighted that TFO Compton included facts that turned out to be wrong (such as connecting the Bridgeway Apt. with the Lakeshore Apartments rather than the South Bridge Apartments) or omitted certain facts (such as subscriber information that tied Anderson's cell number to an address that was not the Bridgeway Apt. or failing to include that Anderson's truck registration had a different address than the Bridgeway Apt.). Likewise, Anderson has shown that some of TFO Compton's statements could have been better explained. For instance, with respect to the seizure of money, TFO Compton writes, "through this investigation Kelton Anderson was named as a member of [Individual #1's] drug trafficking organization." Anderson points to reports of those seizures where Anderson is not mentioned to refute that assertion and show an intentional misrepresentation. But TFO Compton did not assert that Anderson was named in reports of the seizures. He states only that "through the investigation" Anderson was named as a member of the DTO. That TFO Compton could have explained better or said more, does not lend itself to a conclusion that he intentionally misrepresented those facts.

Anderson also tries to bolster his position by offering innocent explanations for some of the conduct observed during the investigation. For instance, he provides weather information from

12

January 20, 2022, to rebut the observation that Anderson "had one hand partially concealed under his shirt or held closely to his midsection" when he left the Edgerton Street address. Anderson contends that it is just as plausible that he wanted to keep his hands warm as it is that he was engaging in drug trafficking activity. What he hasn't shown, however, is that the statement in the affidavit was false. That there may be an innocent explanation for an accurate statement is not enough to warrant a *Franks* hearing. *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993) ("Even otherwise innocent behavior can arouse suspicion in light of other circumstances."); *United States v. Fama,* 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause.").

Finally, Anderson points to myriad factual omissions he believes should have been included, some of which, the Government asserts are reasonably inferred from the affidavit itself. Anderson, for instance, argues that the affidavit should have affirmatively said that Anderson was not involved in the cash seizure stops and it should have stated that no weapons were found on Anderson at either of the traffic stops he was part of. But as the Government points out, the affidavit never implicates Anderson in the cash seizure stops nor does it mention weapons at all during the two traffic stops. A judicial officer may draw inferences from what the affidavit says and what it does not, *see United States v. Prideaux-Wentz,* 543 F.3d 954, 961 (7th Cir. 2008) ("Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant."). Indeed, "[a]ffidavits are not required to use magic words, nor does what is obvious in context need to be spelled out; if a CI … saw guns, he is not required to explain how he knew what a gun looks like." *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000). The Court can find no fault with TFO Compton's omissions of these facts especially when the circumstances make a benign explanation for the omission obvious – i.e.,

there was no need to mention Anderson in relation to the cash seizures because he was not part of the cash seizure stops and there was no need to list what Anderson did not have on his person when he was patted down.

A larger problem for Anderson is materiality. Even if the Court includes all of the omitted information and corrects any misstatements, the Court fails to see how probable cause would be defeated given the totality of the circumstances. CI #1, a known and proven CI, provided information that Anderson sold him drugs from the Bridgeway Apt., drove a white pickup truck, and provided information as to the sales price of the drugs Anderson offered. He also told investigators that Anderson is always heavily armed and Individual #1 was Anderson's supplier. Anderson contends that CI #1's statements are unreliable because the affidavit lacks details of how CI #1 obtained the information and, at least two times, Anderson was stopped by police and wasn't armed so Anderson asserts the information was inaccurate.

When an informant's information serves as the basis for the probable cause determination, the probable cause determination turns on the informant's credibility. *Id.* "To evaluate an informant's credibility, [courts] consider 'the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate.'" *Glover,* 755 F.3d at 816. No one factor is determinative.

Included in the affidavit was a statement that CI #1 had worked with law enforcement before and had proven reliable. While the Court agrees that CI #1's statement that Anderson was "always heavily armed" was never corroborated, nearly all the remaining information was. In fact, some of CI #1's information had already been corroborated by the investigation prior to his interview which gives his information *more* reliability, not less. According to the affidavit,

investigators already knew Anderson drove a white pickup truck, that he was connected to the Bridgeway Apt. and that he had some association with Individual #1 (when he was seen leaving the Edgerton Street address while Individual #1 stood in the doorway). Post-interview, Anderson was seen exiting from the Bridgeway Apt. going to the Trace Way house and observed conducting what TFO Compton reasonably interpreted to be a money drop. So, again, surveillance confirmed Anderson was connected to the Bridgeway Apt. and corroborated CI #1's association between the Bridgeway Apt. and Anderson.

If that were not enough, the three CI's, although interviewed at different times, corroborated each other (for the most part) as well as other facts from the investigation. CI #2, another experienced informant with prior reliability, told investigators that Anderson was dealing cocaine out of his apartment and was involved with Individual #1. CI #3 told investigators that he had been buying cocaine from Anderson at the Bridgeway Apt. in the South Bridge Apartments. Nothing Anderson proffers changes the fact that three individuals connected Anderson with drug trafficking activity and with the Bridgeway Apt.

Anderson argues that information obtained from CI #2 was wrong or incomplete because he named the wrong apartment complex and the affidavit omitted information that CI #2 told investigators that his girlfriend, not CI #2, bought drugs from Anderson at the Bridgeway Apt. Anderson argues that the CI's statements are multi-layered hearsay. But probable cause may be based on hearsay and "a search warrant need not be based on first-hand observations." *United States v. Hollingsworth,* 495 F.3d 795, 805 (7th Cir. 2007). "If the individuals providing the informant's statement to the magistrate are reliable, then it makes little difference whether there are one or two levels of hearsay." (*Id.*). So even if the affidavit contained information that CI #2's

15

girlfriend bought drugs from Anderson, it would still be properly considered in the probable cause calculus.

All told, the Court does not find that the affidavit contained deliberate falsehoods or that it omitted facts with a reckless disregard for the truth. The facts in the affidavit demonstrated Anderson's ongoing drug trafficking through the information obtained from the CIs, and the many inferences drawn by experienced officers from the surveillance, both physical and electronic, of Anderson's comings and goings – all of which signaled that he was part of drug trafficking activities. The high standard necessary under *Franks* to warrant a hearing has simply not been met here. Not only are the alleged misstatements and omissions immaterial to the probable cause finding, but Anderson has not shown that they were intentional or reckless. "[I]t is one thing to say that an affiant falsely or recklessly stated facts from which he thereafter drew conclusions. It is quite another thing to say that the conclusions drawn from the facts fairly stated were falsely and recklessly made." *United States v. Jimenez*, 824 F. Supp. 351, 361 (S.D.N.Y. 1993) (quoting *United States v. Gotti*, 771 F. Supp. 535, 539 (E.D.N.Y. 1991)). As far as the Court can tell, the latter explanation applies here. Anderson has not offered direct or circumstantial evidence of TFO Compton's intent or shown that the conclusions he drew from the fairly stated facts were improper. Without it, the Court cannot authorize a *Franks* hearing. Anderson's Motion for a *Franks* Hearing is DENIED.

### IV.   *Probable Cause*

Having found no deliberate falsehoods or material omissions, the Court is left with the four corners of the affidavit. This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a

judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003)). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted).

TFO Compton's affidavit (and the inferences the judicial officer may draw from the affidavit)[6] leaves no doubt that the judge properly determined probable cause existed to search the Bridgeway Apt. for evidence of drug trafficking activities. Although Anderson argues that there is no direct link between drug activities and the Bridgeway Apt., none is required. *Zamudio*, 909 F.3d at 175 (stating probable cause does not require direct evidence linking a crime to a particular place). Although the evidence contained in the affidavit is circumstantial, when considering the totality of the circumstances, all the dots between drug trafficking activity and Anderson are connected. See *United States v. Carswell*, 996 F.3d 785, 793 (7th Cir. 2021) ("When we evaluate a probable cause finding, we do not view the individual facts in isolation."). The court is convinced that the information in the warrant affidavit, taken together, was sufficient to cause a reasonably

---

[6] "[I]ssuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018).

prudent person to believe that a search of the Bridgeway Apt. would uncover evidence of drug trafficking activity. The Motion to Suppress is DENIED.

## **CONCLUSION**

Both the Defendant's request for a *Franks* hearing (ECF No. 44) and the Motion to Suppress (ECF No. 43) are DENIED. A scheduling order will issue by separate entry.

SO ORDERED on January 5, 2024.

                                          s/ *Holly A. Brady*
                                          CHIEF JUDGE HOLLY A. BRADY
                                          UNITED STATES DISTRICT JUDGE