# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

UNITED STATES OF AMERICA,      )
                                                   )
v.                                  )     Cause No. 1:23-CR-9-HAB
                                                   )
KELTON ANDERSON              )
                                                   )

## OPINION AND ORDER

Defendant, Kelton Anderson, a suspected drug dealer charged with drug and gun offenses, raises an overbreadth challenge to a search warrant authorizing the seizure and subsequent search of cell phones from his 2019 GMC Truck ("GMC Truck"). He argues that probable cause for the seizure of the phones was improperly based solely on the swearing officer's "experience and expertise" in drug trafficking, not on any direct information linking the cell phones to the drug trafficking activity outlined in the warrant affidavit. He moves to suppress the cell phones and any data retrieved from them. (ECF No. 74). At the parties' request, the Court held an evidentiary hearing on May 2, 2024. Post-hearing briefing was ordered, ECF No. 79, and filed, ECF Nos. 85-87, and the matter is ripe for consideration. Because the Court finds that the warrant-issuing judge properly found probable cause and the data retrieval was narrowly tailored to evidence of drug trafficking activities, the Motion to Suppress will be DENIED.

## DISCUSSION

### A.  Search Warrant Affidavit[1]

---

[1] Criminal cases and theories often evolve as facts are uncovered. So, it is here. In his motion to suppress, one of Anderson's original arguments was that officers illegally seized a cell phone from his hand when they initiated a stop of his GMC Truck to execute the search warrant. Because this argument involved facts outside the four corners of the warrant affidavit, the parties requested an evidentiary hearing. *See* Evid. Hr'g Tr., ECF No. 84.  Following the evidentiary hearing, Anderson abandoned this argument and, as set out above, narrows his challenge to whether the warrant that authorized the vehicle search for "evidence of drug trafficking activity" was overly broad when it included

On February 7, 2023,[2] Detective and Task Force Officer Darren Compton ("TFO Compton") of the Allen County Police Department ("ACPD") obtained a search warrant for the GMC Truck[3] to search for evidence of drug trafficking activities. (Gov't Hr'g Ex. 5, Truck Aff. at ___). Specifically, the warrant affidavit sought seizure of the following: "Cocaine and other controlled substances; paraphernalia; United States Currency; firearms and/or weapons; digital and electronic devices, computers, cellular phones, including internal call logs and texts related to this investigation and records of drug transaction and/or other financial information related to drug trafficking, which constitutes evidence of alleged drug transactions and illegal possession of said controlled substances and firearms…" The warrant followed multiple DEA investigations beginning in July 2021 and lasting through the Defendant's arrest in February 2023. Supporting the request for a search warrant was TFO Compton's affidavit, a nine-page summation of the investigation.

TFO Compton swore that in July 2021, a wiretap investigation conducted by the DEA in Milwaukee, Wisconsin, and South Bend, Indiana, led investigators to "Kelton Anderson's residence" at XXXX Bridgeway Drive, Apt. 2B ("Bridgeway Apt."). (Truck Aff., at 1). Although Anderson was not the main target of the wiretap investigation, TFO Compton and DEA Task Force Officer Peter Mooney ("TFO Mooney") conducted surveillance at the Bridgeway Apt. and

---

[2] the seizure of all cell phones and certain information contained on those phones. This latter argument requires a thorough examination of the warrant affidavit submitted for the search of the GMC Truck. Given the evolution of the Defendant's argument, the Court needn't expend significant energy examining detailed hearing testimony. Instead, the Court focuses its attention on the warrant affidavit authorizing the search of the GMC Truck.

[2] The warrant affidavit bears the date February 7, 20**22**, but that appears to be a typographical error. The warrant signed by the judicial officer shows it was signed on February 7, 20**23**. This is consistent with both the facts sworn in the warrant affidavit and the date of Anderson's arrest on February 9, 2023.

[3] The description of the GMC Truck is contained in the affidavit as a white 2018 GMC Pickup, Registration Plate TK845OAE, VIN: 3GTU2PEC8JG504106.

observed an unidentified male arrive at the residence, enter it for a brief time, exit the residence and place an item in the trunk under the spare tire. TFO Compton believed this activity to be consistent with discussions in the wiretap investigation that a money pickup would be occurring. TFO Compton also stated "[d]uring that investigation which was corroborated by interviews of suspects, Anderson received 1 to 2 pounds of cocaine from their main target." (*Id.* at 2)

In October and November 2021, the DEA seized a total of $230,000 in two recoveries. Physical and electronic surveillance and interviews which led to the cash seizures pointed to an individual ("Individual #1")[4] believed to be a participant and leader in a drug organization. The investigation revealed that Individual #1 was attempting to launder the money seized through the Mexican cartels. Anderson was named as a member of Individual #1's drug trafficking organization ("DTO"). (Truck Aff. at 2). In August 2022, 9 months after the cash recoveries, a suspect involved in this fall 2021 investigation told investigators that Anderson was still involved with Individual #1's DTO and dealing narcotics. (*Id.* at 3).

On December 13, 2021, investigators observed a white GMC truck with license plate no. TK345OAE pull into XXXX Edgerton Street ("Edgerton Street address"). Anderson was identified as the driver of that GMC truck. On January 20, 2022, the same GMC truck was parked in the driveway of the Edgerton Street address. During physical surveillance, Anderson is observed jogging from the front door of the residence to the truck with one hand partially concealed under his shirt or "held closely to his mid-section." Anderson entered the truck. Individual #1 was observed standing in the doorway of the Edgerton Street address.

In April 2022, TFO Compton and others interviewed a confidential human source ("CI #1"). CI #1 had been arrested for narcotics violations before and was known to provide credible

---

[4] Individual #1 is specifically identified in the unredacted affidavit which the Government filed under seal. For now, the identity of Individual #1 is not necessary to the issues raised in the motions.

information in other investigations. CI #1 told investigators that CI #1 purchases narcotics from Anderson, that Anderson lives at the Bridgeway Apt., drives a white truck, and charges $30,000 for a kilogram of cocaine, $2,000 for 50 grams of fentanyl, and $900-$950 for an ounce of cocaine. CI #1 advised that Anderson is "always heavily armed." (Truck Aff. at 3). CI #1 also identified Individual #1 as Anderson's narcotics supplier.

Investigators interviewed a second confidential human source ("CI #2") in September 2022. CI #2 had been arrested for narcotics violations in the past, had been a federal confidential informant in the past, and previously provided credible information leading to arrests. (Truck Aff. at 3). CI #2 stated that Anderson was dealing ounces of cocaine out of his apartment in Lakeshore Apartments. TFO Compton added to the affidavit that the Bridgeway Apt is located in the Lakeshore Apartment complex. (*Id.*). CI #2 stated that Individual #1 was dealing narcotics with Anderson.

On October 11, 2022, task force officers along with the DEA conducted surveillance at the Bridgeway Apt. They observed Anderson leave the entrance to the Bridgeway Apt. and drive away in the GMC truck. Investigators followed Anderson to an address on Trace Way ("Trace Way house") in Fort Wayne, IN. While Anderson was observed parked there, three more vehicles arrived, including a silver SUV which Individual #1 was known to use. Officers positively identified Individual #1 and his son. A black male exited from one of the vehicles and carried a bag into the Trace Way house. While this was ongoing, a male entered Anderson's vehicle on the passenger side and exited a few minutes later. Anderson then left the area driving the GMC truck. (Truck Aff., at 3). Through his 22 years of experience in large scale narcotics related crimes, TFO Compton averred that illegal narcotics dealers commonly conduct a money drop at a residence

where multiple people drop off money previous drug debts or in anticipation of a new shipment of narcotics. (*Id.* at 4).

Surveillance followed Anderson in the GMC Truck from the Trace Way house and conducted a traffic stop. Anderson was talking on his cell phone when stopped. A K-9 officer used his certified narcotics detection canine to conduct an open air sniff on Anderson's vehicle. After the canine alerted, officers searched the vehicle. Officers located marijuana residue on the floor of the vehicle and in the cup holder. Nothing else of value to the investigation was in the vehicle.

During the traffic stop, surveillance was also taking place at the Trace Way house. Officers observed a male black exit a vehicle parked in the driveway of the Trace Way house. This individual walked around the complete circular drive in the neighborhood. TFO Compton believes based on his training and experience that the individual was conducting counter-surveillance after Anderson called him telling him he had been stopped. (Truck Aff., at 4).

On October 14, 2022, Allen Superior Court Magistrate Keirns issued a vehicle tracking warrant for the GMC truck. The tracker was deployed on the vehicle on October 17, 2022. This tracking warrant was renewed in each subsequent month through January 2023.

Based on the tracking information and physical surveillance, TFO Compton averred that Anderson and the GMC truck were "making suspicious stops" in parking lots and meeting individuals for short periods of time. (Truck Aff., at 5). Again, based on his training and experience, TFO Compton states that it is common for drug dealers to meet with their drug customers and suppliers in parking lots or public places for short time periods. TFO Compton explains that the public meeting spots are so that the drug customers do not know where the drug dealer lives and to prevent their residence from being robbed. (*Id.*).

On November 1, 2022, geolocation data from the vehicle tracking device showed that the GMC Truck was driven to an apartment complex in Detroit, Michigan, stayed there for 20 minutes, and returned to Indiana. Once in Indiana, K-9 officer Cpl. Ben Fries ("Cpl. Fries") conducted a traffic stop of the truck. Kenneth Menefee ("Menefee") was driving the truck and Anderson was a passenger. When officers approached the vehicle, they smelled the odor of raw marijuana coming from inside the vehicle. Anderson exited the vehicle and Cpl. Fries located marijuana on his person. Menefee admitted that marijuana and money inside the vehicle belonged to him. Both Menefee and Anderson were placed in protective custody inside a patrol car. Anderson refused to consent to a vehicle search. (Truck Aff., at 5).[5]

Cpl. Fries and his canine partner, Django, conducted a free-air sniff of the vehicle. Django alerted to the presence of drugs in the vehicle and officers located 12.7 grams of marijuana and $9,000.00 inside it. Menefee told officers that he and Anderson went to Ann Arbor, Michigan, to buy a Sprinter Van but once they arrived, he didn't buy it. This information conflicted with the geolocation data which showed the vehicle had gone to Detroit. Menefee and Anderson were transported to the Allen County Police Department, issued summons for possession of marijuana, and released. (Truck Aff., at 5-6).

On November 29, 2022, Anderson was observed driving the GMC Truck and arriving at a residence on Normandale Drive ("Normandale Drive residence") in Fort Wayne, Indiana. While there, a male white subject arrived at the Normandale Drive residence and exited a few minutes later carrying something in his hand. The male white subject left the Normandale Drive residence

---

[5] Although it is not contained in this affidavit, during this stop, both Anderson and Menefee had cell phones seized from them. See Evid. Hr'g Tr. at 58-59. TFO Compton testified at the evidentiary hearing that he prepared affidavits for warrants to search the content of these phones to see "if there was any narcotics transactions on the cell phones." (*Id.*). The affidavit and corresponding warrant for Anderson's iPhone were admitted as exhibits during the evidentiary hearing. (Dfdt Hr'g Exs. B and C). Because this information was not in the affidavit and, it does not appear that it was known to the warrant-issuing judge, the Court includes it solely for context.

and drove to a gas station where he picked up an individual sitting on the curb. TFO Compton wrote that the individual on the curb "appeared" to have been dropped off there while the white male subject went to meet Anderson. TFO Compton stated that it is common for drug dealers to drop people off before meeting with their supplier so the other person does not know where the drug supply comes from. (Truck Aff. at 6).

Between October 2022 and January 2023, physical and electronic surveillance showed Anderson going to the Normandale Drive residence multiple times a week where he met with individuals for a short period. Given the comings and goings at the Normandale Drive residence, along with his training and experience, TFO Compton believed the Normandale Drive residence to be a stash house. Investigators also observed Anderson make 11 trips to Orchard Place Apartments[6] with an average duration of 12 minutes spent there and then returning to the Normandale Drive residence. Through TFO Compton's training and experience, Anderson's short trips back and forth suggest he was picking up narcotics at one location and then taking the drugs to another location to distribute them. TFO Compton asserts that this is a common practice of "higher-level narcotics dealers." (Truck Aff., at 7).

In January 2023, two trash pulls were conducted at the Normandale Drive residence. During both pulls, items consistent with drug trafficking, such as sandwich bags with corners removed, and Ziploc baggies that field tested positive for controlled substances, were found. (Truck Aff., at 7-8). Through TFO Compton's training and experience it is common for drug dealers to place narcotics into plastic bags for distribution. Dealers will often place narcotics in the

---

[6] There is no information about the Orchard Place Apartments other than Anderson made 11 short trips there between December 6, 2022, and January 2, 2023.

corner of a sandwich bag and twist, cut, or knot the corner for sale and transport purposes. (Truck Aff., at 8)

On February 2, 2023, investigators interviewed CI #3 who had been arrested for narcotics charges and provided information that was independently verified. CI #3 told investigators that he had been purchasing cocaine from Anderson at the Bridgeway Apt.[7]

Based on these facts, TFO Compton swore that Anderson has continuously dealt narcotics out of the Bridgeway Apt. since July 2021. Additionally, he represented that he had been a police officer for over 29 years, has investigated narcotics related crimes for over 22 years, and has participated in over 1000 narcotics investigations. He stated that he received training in the methods and practices of narcotics traffickers. From this background, TFO Compton made the following observations:

- it is common for drug trafficking organizations to involve multiple subjects selling the narcotics with the source of supply running the business;

- it is common for drug traffickers to possess firearms on their person, in their homes, or in vehicles;

- drug traffickers commonly utilize cell phones to contact their customers and set up deals;

- it is common for drug traffickers to transport money and drugs and often have GPS devices inside their vehicle which might lead to other co-conspirators;

- drug traffickers commonly keep track of their drug transactions via written, typed, printed, or computer records.

(Truck Aff., at 8-9). Given his training and experience, TFO Compton averred that he believed that the GMC Truck may contain evidence of the above items.

---

[7] CI #3 reported that he had purchased cocaine from Anderson at an apartment in South Bridge Apartments. The Bridgeway Apt is in the South Bridge Apartment complex.

From the above information, the issuing state court judge found probable cause to issue the warrant authorizing the search of the GMC Truck and the seizure of the described evidence in the affidavit.[8]

### B.  The Stop and Search/Seizure of the GMC Truck

As set out in footnote 1, the Court need not go into great detail relating to the stop of the GMC Truck other than to say that on February 9, 2023, at roughly 5:00 a.m., Det. Amanda Miller ("Det. Miller") with the Fort Wayne Police Department ("FWPD") initiated a traffic stop on the GMC Truck. (Hr'g Test., ECF No. 84, at 9). During this stop, captured on both Det. Miller's body camera and her in-car camera, Det. Miller took possession of two iPhones, one from Anderson's person and the other from inside the GMC Truck. (Videos, Gov't Hr'g Ex. 1). The Government identified these two iPhones as Gov't Hr'g Exs. 12 ("Black iPhone") and 13 ("Silver iPhone"). Anderson was taken into custody and a sworn criminal complaint was presented to Magistrate Judge Gotsch on February 10, 2023.

The parties stipulated that on February 24, 2023, the Black iPhone was connected to GrayKey, a forensic access tool designed to unlock a cellular telephone for data extraction. (Stipulation, ECF No. 81, at ¶1). On March 20, 2023, a passcode was obtained to allow a full file system extraction. (*Id.*)[9]. On an unspecified date, the Silver iPhone was connected to GrayKey and to Cellebrite Premium software, but neither of these tools were able to access the data for download without a consented passcode. (*Id.* at ¶2).

### C.  Analysis

---

[8] Although it is not relevant to the issues raised here, search warrants were also issued for the Bridgeway Apt. and the Normandale Drive residence based on substantially the same information from TFO Compton as set out in the Truck Affidavit.

[9] No information is provided on how the passcode was obtained.

1.  *Probable Cause*

The Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause ... and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In turn, "[t]he particularity requirement 'ensures that the search will be carefully tailored to its justifications and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Indeed, the Warrants Clause both "requires particularity and forbids overbreadth." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013); *see United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020).

"Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006); see also *United States v. Miles*, 86 F.4th 734, 742 (7th Cir. 2023) ("This particularity requirement protects persons against the government's indiscriminate rummaging through their property," and it "ensures that the scope of a search will be confined to evidence related to a specific crime that is supported by probable cause."). Anderson contends that the facts of the warrant do not support a finding of probable cause to search and seize the cell phones retrieved from his vehicle on February 9, 2022, and even if probable cause existed, the warrant does not identify any particular cell phone to be seized.

In support of his argument, Anderson first turns to the Supreme Court's decision in *Riley v. California*, 573 U.S. 373, 393 (2014) wherein the Justices discussed modern cell phone usage in the context of obtaining a warrant to search cell phones seized incident to an arrest.

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life[.]" The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.

*Id.* at 403 (citations omitted). *Riley,* then, acknowledges that the search and seizure of personal electronic devices like a modern cell phone implicates special concerns given the breadth of materials kept on these devices. *Id.* at 393.

But *Riley*'s holding that a warrant is required to search a cell phone, while informative, does not assist the Defendant much here as the Government, in fact, had a warrant to seize cell phones from the GMC Truck and to retrieve certain data contained in them. *See United States v. Inyang*, 2024 WL 2789392, at *4 (W.D. Tex. May 30, 2024) (where government had a warrant, determined by the court to be valid, *Riley* does not preclude the search of cell phones seized pursuant to the warrant). Thus, the true question, as Defendant acknowledges, is whether the affidavit authorizing the seizure of cell phones and the retrieval of "internal call logs and texts related to this investigation and records of drug transactions and/or other financial information related to drug trafficking" (Gov't Hr'g Ex. 5 at 10), was based on probable cause.

The law is well established that probable cause to search a location—or, in the case of smart phones, – to demand retrieval of particular items or records is demonstrated where a totality of circumstances indicates a "fair probability that contraband or evidence of a crime will be found" thereby. *Gates*, 462 U.S. at 238. This standard does not demand "hard certainties," *id.* at 231

11

(internal quotation marks omitted), but it does require more than a "hunch," the latter being insufficient to support even an investigative stop, *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968). Rather, probable cause must be grounded in sufficient facts to establish the sort of "fair probability" on which "reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 238, 241; *see Florida v. Harris*, 568 U.S. 237, 244 (2013) (describing probable cause as "practical," "common-sensical," "all-things-considered" standard for assessing probabilities in particular factual context). Regardless of whether the probable cause determination is being made in the field by trained law enforcement officers or whether it is made by affidavit to a judicial officer to obtain a warrant, this general concept of probable cause remains the same.

A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003)). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted). This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009).

Anderson asserts that the warrant-issuing judge could not have determined from the affidavit that a fair probability existed that evidence of drug trafficking would be found in any cell

phones seized from the GMC Truck because the affidavit contains no references to any cell phones being used in the drug trafficking activity set out in the affidavit. Anderson asserts that the absence of any nexus between the cell phones seized on February 9, 2023, and Anderson's alleged drug trafficking invalidates the finding the judge made that probable cause was present.

Anderson analogizes his situation to that in *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017). In *Griffith*, the defendant was suspected of a year-old gang-related murder. Following the murder, he was incarcerated for another crime for a year. *Id. at 1269.* When he was released, officers sought a warrant to search his house and seize, among other things, all electronics found there, including his cell phone. The warrant affidavit gave no reason to suppose that the suspect owned a cell phone (or other electronic device) at all, and there was also a "limited likelihood that any cell phone discovered in the apartment would contain incriminating evidence of Griffith's suspected crime." *Id.* at 1272–75. Rather, to justify the search, the Government argued that probable cause could be inferred from the ubiquity of cell phones: "[B]ecause nearly everyone now carries a cell phone, and because a phone frequently contains all sorts of information about the owner's daily activities, a person's suspected involvement in a crime ordinarily justifies searching her home for any cell phones." *Id.* at 1275. The D.C. Circuit rejected this argument and held that it was impermissible to issue a warrant granting officers unfettered access to every electronic device in the apartment.

Anderson asserts that the outcome in his case should be married to the outcome in *Griffith*. He asserts that the warrant affidavit in his case provided "no basis, other than Compton's training and experience, to believe that 1) Anderson owned a cell phone in February 2023; 2) that Anderson owned a computer or any other digital or electronic device; or 3) that Anderson used any digital or electronic device in his alleged drug trafficking." (ECF No. 85 at 10).

But, as the Government correctly points out, the situation in *Griffith* is wholly different than the facts of Anderson's case and this context matters – meaningfully. *Griffith* did not involve widespread narcotics trafficking. And the nature of an investigation informs the probable cause analysis inasmuch as the information provided in the affidavit allows reasonable inferences to be drawn by the issuing judge. The affidavit detailed Anderson's participation in a long-term narcotics trafficking investigation. His comings and goings were tracked over an extended period and his GMC Truck was observed in many, if not a majority, of the surveillance that was conducted. Given these basic premises underlying the warrant application, Anderson, for good reason, does not contest the issuing judge's probable cause determination to search the GMC Truck, but instead focuses on the cell phones seized from the truck.

The Government emphasizes, some crimes, by their very nature, are suggestive of what items may be linked to that particular crime or where that evidence may be located. In the context of drug trafficking crimes, "[t]he Seventh Circuit has repeatedly described items that could serve a variety of legal purposes—like digital scales, razor blades, latex gloves, plastic sandwich baggies, cell phones, cash, and firearms—as tools of the drug trade." *United States v. Jones,* 2023 WL 6386687, at *5 (S.D. Ind. Oct. 2, 2023) (citing cases); see also, *United States v. Evans*, 826 F.3d 934, 938 (7th Cir. 2016) (plastic baggies and baggie corners are "tools of the trade" and "indicia" of drug trafficking); *United States v. Portalla,* 496 F.3d 23, 27 (1st Cir. 2007) (recognizing that "cell phones ... [are] essential tools of the[ ] drug trade"); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) ("weapons are 'tools of the trade' of drug dealers.");*United States v. Slater,* 971 F.2d 626, 637 (10th Cir. 1992) (stating that a cell phone is a "recognized tool of the trade in drug dealing"); see also, *United States v. Delva*, 13 F. Supp. 3d 269, 277 (S.D.N.Y. 2014)("The association between narcotics trafficking ... and cell phones has been long

14

established—cell phones can store information and images relating to the crime and participants in the crime (that is, who bought and sold the drugs).”); *United States v. Garcia*, 2023 WL 4850553, at *7 n.4 (D. Conn. Jul. 28, 2023) (“[T]he association between cell phones and narcotics trafficking is pervasive and long established, such that cell phones are essentially the ‘tools of the trade.’”). Thus, when faced with a lengthy investigation of drug trafficking activity in the warrant affidavit, the warrant-issuing judge was entitled to draw the common-sense inference that evidence of drug trafficking, including known tools of the trade, would be found in the GMC Truck.

Aside from cell phones being known and obvious drug trafficking tools, the affidavit itself outlined months of meetings between Anderson and suspected drug customers at various houses and parking lots. Logic dictates that these meetings had to be coordinated by some means of communication. In the Government’s view, “U.S. Mail and carrier pigeons are not a practical way to coordinate drug deals.” (ECF No. 86 at 14). And the Court is hard-pressed to disagree, especially given the Seventh Circuit’s recognition of cell phones as a drug trafficking tool to coordinate drug transactions and customers and their pervasiveness in modern society.[10] *See United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (holding probable cause is about fair probabilities rather than near certainties and “…the judges evaluating probable cause are ‘not required to check their common sense at the door and ignore the fact that most people ‘compulsively carry cell phones with them all the time.’”)(quoting *Carpenter v. United States*, 586 U.S. 296, 311 (2018)).

---

[10] While an issuing judge is not required to ignore the ubiquity of cell phones in the probable cause analysis, *Griffith* made clear that a judge cannot rely **only** on this fact to justify the issuance of a warrant. *See also*, *United States v. Bertini*, 2023 WL 8258334, at *9 (S.D.N.Y. Nov. 29, 2023) (“Acknowledging that cell phones have become ubiquitous in our society, a finding of probable cause cannot be premised solely on an agent's assertion that most people carry cell phones most of the time.”). Indeed, *Griffith* advises that if a person’s carrying of a cell phone alone could justify its seizure without any connection or inference linking it to a particular crime, the Fourth Amendment’s probable cause requirement would have little teeth.

If the above were not enough to end the inquiry, the Court has no trouble concluding that when the common-sense inferences from the case specific affidavit are combined with the expert opinion of TFO Compton, the issuing judge properly found probable cause to seize phones found in the GMC Truck. *See United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009) ("It is well established as a general matter that a magistrate evaluating a warrant application is entitled to take an officer's experience into account in determining whether probable cause exists."); *United States v. Zamudio*, 909 F.3d 172, 176 (7th Cir. 2018) (probable cause existed based on experienced agent's assertions as to how drug dealers generally operate, and where evidence and contraband is generally found); *United States v. Garcia*, 2023 WL 4850553, at *7 (D. Conn. July 28, 2023)("a warrant application must contain 'enough case-specific evidence to nudge [an officer's] training and experience across the line from sheer speculation to probable cause.'") (quoting *United States v. Garlick*, 2023 WL 2575664, at *6 (S.D.N.Y. Mar. 20, 2023). TFO Compton based his opinions on the facts observed throughout the investigation, his 29 years in law enforcement, 22 years of which he has spent working on over 1,000 narcotics cases. The warrant-issuing judge was entitled to credit his training and experience in this area, especially when confronted with nine-pages of investigative facts.

This Court's conclusion that probable cause existed under the circumstances here is consistent with a similar ruling by the district court in *United States v. Coffey,* 2023 WL 8891508, at *11 (E.D.N.Y. Dec. 26, 2023). There, a magistrate judge authorized an anticipatory warrant for a home based on an affidavit from a special agent for Homeland Security advising that authorities had intercepted a suspected narcotics package. Authorities linked the address on the package to a known narcotics trafficker. The affidavit described what the special agent, based on his 14-years of experience and training, expected to find in the home during the execution of the search warrant.

16

The affidavit sought to seize, among other evidence drug trafficking, "electronic devices, including cellular telephones, tablets, and computers." Two cell phones and other electronic devices were seized during the execution of the warrant and the defendant moved to suppress the evidence located on the devices. In upholding the warrant against an overbreadth and probable cause challenge, the Court concluded:

> The role of electronic devices to narcotics trafficking is apparent throughout Special Agent Flynn's affidavit. For example, the affidavit explains that Special Agent Flynn "personally participated in the execution of search warrants and in numerous controlled deliveries of narcotics" where he "frequently found" evidence of narcotics trafficking, "such as cell phones, tablets, and computers." Special Agent Flynn also attests that—"based on [his] experience and training"—the nature of narcotics trafficking necessarily would involve those electronic devices. Courts within this Circuit concur, routinely recognizing an association between electronic devices and narcotics trafficking—such that electronic devices are essentially the "tools of the trade."

*Coffey*, 2023 WL 8891508, at *11 (internal record citations omitted).[11]

While the Court finds this case on point and corroborative of the Court's conclusion, a word of caution is necessary. The Court's holding relies on the pervasive and long-established association between cell phones and narcotics trafficking, and the Court is cognizant that the decision can be fairly read to hold that cell phones are presumptively searchable in most drug trafficking cases. But the same types of associations cannot be made for all crimes. *See United States v. Garcia*, 2023 WL 4850553, at *7 n. 4 (D. Conn. July 28, 2023) (recognizing that unlike drug trafficking crimes, there is no long-standing connection between cell phones and homicide).

---

[11]But see, *United States v. Alvarez*, 2024 WL 3887724, at *2 (9th Cir. Aug. 21, 2024) (finding warrant to search cell phone media files overbroad despite finding supporting affidavit established probable cause to believe that evidence of communications about drug-sales activities would be found on the cell phones because the affidavit provides no basis to conclude that the cell phones' media files would contain evidence of drug trafficking).

And the Court emphasizes that affidavits containing "blanket generalization[s] about how 'people who commit crimes' act" …are insufficient" to support a probable cause finding. *United States v. Bertini*, 2023 WL 8258334, at *9 (S.D.N.Y. Nov. 29, 2023). This case should not be extended beyond the type of case and facts relied on here.[12]

### 2. *Overbreadth and Particularity*

With the Court's conclusion that probable cause for the search and seizure of the cell phones was proper, Anderson next argues that there was no way for the officers executing the warrant to know that the phones located in the GMC Truck belonged to Anderson. Anderson further argues that the warrant allowed an unfettered rummaging of the data on the phone. Both arguments are non-starters

"[A] warrant must explicate the items to be seized only as precisely as the circumstances and the nature of the alleged crime permit." *United States v. Wenzel*, 854 F.3d 957, 961 (7th Cir. 2017). Essentially, Anderson argues that TFO Compton should have identified the specific cell phones to be seized in the supporting affidavit. But "courts do not ask whether a warrant could have been *more* precise; rather, we ask whether a warrant was sufficiently precise to satisfy constitutional requirements." *Id.* "Granular detail" is not required; generic descriptions are sufficient. *Archer v. Chisholm*, 870 F.3d 603, 616 (7th Cir. 2017). Defendant argues that the affidavit did not, as it often does, contain any reference to specific cell phones by cell phone number or by some other description. Instead, the authorized warrant from the affidavit sought unspecified "cell phones" found during the search of the GMC Truck. Yet, Anderson has made no assertion that specific cell phones had been identified by TFO Compton during the investigation

---

[12] Whether cell phones are presumptively searchable in narcotics cases as "tools of the trade" is a question that, based on the Court's research, no appellate court has answered to date.

and omitted from the affidavit. In essence, Anderson concedes that the generic description, for which the Court has found probable cause to search and seize, was all the information that existed.

Further, when Anderson was stopped, he was the only individual in the vehicle – a vehicle that was repeatedly documented in the affidavit as being present during observed drug trafficking activities. Criminals in drug trafficking enterprises "do not neatly label which cell phone belongs to whom," see *United States v. Vizcarra-Millan*, 15 F.4th 473, 503 (7th Cir. 2021), and any phone located in the vehicle could reasonably contain evidence of illegal drug trafficking activity. *See United States. v. Paulette*, 2015 WL 4624265 (S.D. Ill. Aug. 3, 2015) ("It is well-established that ... traffickers often have more than one cell phone.") (collecting cases); *United States v. Robinson*, 2024 WL 2862111, at *6 (E.D. Wis. June 6, 2024) (holding that law enforcement "had good reason to believe that Defendant was engaging in trafficking of contraband on a relatively large scale, such that the use of multiple cell phones on Defendant's part could be considered warranted and reasonable."). Simply, whether Anderson owned the cell phones retrieved from the GMC Truck or whether the phones were utilized by others in the drug trafficking crimes outlined in the warrant affidavit matters little when they were found inside the GMC Truck that was fastidiously tied to trafficking activities.

One last point that speaks on the warrant's breadth. It is certainly true that the breadth of a search must not "outrun[ ] the probable cause supporting the warrant" *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011); s*ee generally Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (observing that search authorization is properly limited to "specific areas and things for which there is probable cause" to search to "ensure[ ] that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit"). While the warrant didn't identify specific cell phones

by phone or serial number to be seized, the warrant in this case did not permit an indiscriminate search of the cell phones that were recovered.  The warrant included express limitations on agents' authority to examine any cell phones seized. It limited the information to be retrieved from the devices to evidence of drug trafficking activity in call logs, texts, and financial transactions. This describes the type of information authorities believed likely to be found on the phone. The warrant did not authorize the Government to rummage through the phones to identify Anderson's musical tastes on Spotify, hunt through his personal photographs or retrieve innocent text messages with his mother… unless those items related to the drug trafficking activity set out in the warrant affidavit. In this way, the warrant avoided the type of "wide-ranging exploratory searches the Framers intended to prohibit." *Garrison*, 480 U.S. at 84. *See also*, *United States v. Kinney*, 2024 WL 3450988, at *1 (9th Cir. July 18, 2024) ("Because the warrant limited the search to the use of digital evidence connected to the alleged crimes as described in an incorporated affidavit, it met the specificity requirements of the Fourth Amendment."); *Robinson*, 2024 WL 2862111, at *5 (warrant is not overly broad "if the warrant cabins the things being looked for by stating what crime is under investigation.").

.        In sum, reading the affidavit as a whole, in a common sense, non-technical manner, *see United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010), with due regard for the nature of the investigation and the conclusions drawn therefrom, and especially giving "'great deference' to the issuing judge's finding of probable cause," *United States v. Fifer*, 863 F.3d 759, 764 (7th Cir. 2017) (quoting *United States v. Dessart*, 823 F.3d 395, 400 (7th Cir. 2016)), the Court finds a substantial basis existed for concluding there was probable cause that evidence of a crime would be found on any cellphone located in the GMC Truck.[13] Further, the Court finds that the warrant

---

[13] The Government urges the Court to also make a determination that even if the warrant was overbroad or lacked probable cause, the search would be saved by the "good faith" exception. *See United States v. Leon,* 468 U.S. 897,

is sufficiently particular, not overbroad, and satisfies the Fourth Amendment's specificity requirement. The Motion to Suppress is DENIED.

## **<u>CONCLUSION</u>**

For the reasons above, the Motion to Suppress (ECF No. 74) is DENIED. A scheduling order will issue by separate entry.

SO ORDERED on September 16, 2024.

<u>s/ *Holly A. Brady*</u>
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT JUDGE

---

104 S.Ct. 3405 (1984). The Government relies on the Seventh Circuit's decision in *United States v. Vizcarra-Millan,* 15 F.4[th] 473 (2021). In that case, the panel addressed a similar overbreadth argument to the one here. The court bypassed the probable cause question raised and decided the case by finding that the *Leon* exception applied to validate the search. Here, the Court is content resting its decision on the validity of the warrant.