UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Cause No. 1:23-CR-9-HAB |
| | ) |
| KELTON ANDERSON | ) |
| | ) |

**OPINION AND ORDER**

Kelton Anderson ("Anderson") faces drug and gun offenses in a three-count superseding federal indictment. (ECF No. 95). These charges stemmed from a lengthy investigation that included GPS vehicle tracking warrants, cell phone data, and evidence seized following execution of a search warrant at an apartment, alleged to be Anderson's, located on Bridgeway Drive ("the Bridgeway Apt.") in Fort Wayne, Indiana. Anderson has previously moved to suppress the evidence seized from the Bridgeway Apt. and from the seizure and subsequent search of a cell phone taken from his truck at the time of his arrest. He also sought a *Franks* hearing asserting that the search warrant affidavit authorizing the search of the Bridgeway Apt. contained material omissions or misrepresentations by the affiant that undermined the probable cause determination by the judge. (ECF Nos. 43, 44, and 74). After the Court denied relief in both the motions to suppress and the *Franks* hearing request, see *Franks v. Delaware,* 438 U.S. 154 (1978) (ECF Nos. 64, 88), Anderson filed the present Consolidated Motion for *Franks* hearing in which he reasserts his request for a *Franks* hearing but now he asks the Court to look at all the warrants issued in this case. Having now reviewed every warrant sought and obtained by the Government, the Court finds no basis for a *Franks* hearing. The Court also finds adequate probable cause for the issuance of the GPS vehicle tracking warrants, the only warrants remaining that the Court has not reviewed. The

Court also reaffirms its prior rulings denying the motions to suppress, finding the existence of probable cause supporting issuance of those warrants, and its denial of the *Franks* hearing request.

**SEARCH WARRANT AFFIDAVITS**

Six search warrant affidavits were submitted to state magistrates in this case. Four of them were for GPS vehicle tracking warrants for Anderson's white GMC Truck ("GMC Truck"). One was for the search of the Bridgeway Apt. and one was for the search of the GMC Truck and cell phones located inside that truck. As it goes in large scale investigations, each subsequent warrant built on facts supporting earlier warrants. This Court has already determined that the last two search warrants issued – the warrants for the Bridgeway Apt and the GMC Truck – were valid warrants supported by probable cause. (ECF Nos. 64, 88). The Court also found no material omissions or misrepresentations by the swearing officer that would warrant a *Franks* hearing with respect to the Bridgeway Apt. warrant. Anderson now reasserts his *Franks* hearing request and his probable cause challenges for the four GPS vehicle tracking warrants.

   A. **GPS Tracking Warrant 1 ("GPS 1")**

On October 4, 2022, Detective and Task Force Officer Darren Compton ("TFO Compton") of the Allen County Police Department (ACPD) obtained GPS 1 for the GMC Truck. (ECF No. 126, Gov't Ex. 1). Supporting the request for a search warrant was TFO Compton's affidavit, a three-page summation of the investigation.

TFO Compton swore that in July 2021, a wiretap investigation conducted by the DEA in Milwaukee, Wisconsin, and South Bend, Indiana, led investigators to "Kelton Anderson's residence" at the Bridgeway Apt. (Gov't Ex. 1, at 1). Although Anderson was not the main target of the wiretap investigation, TFO Compton and DEA Task Force Officer Peter Mooney ("TFO Mooney") conducted surveillance at the Bridgeway Apt. and observed an unidentified male arrive

2

at the residence, enter it for a brief time, exit the residence and place an item in the trunk under the spare tire. TFO Compton believed this activity to be consistent with discussions in the wiretap investigation that a money pickup would be occurring. TFO Compton also stated "[d]uring that investigation Anderson received 1 to 2 pounds of cocaine from the main target." (*Id.*)

In October and November 2021, the DEA seized a total of $230,000 in two recoveries. Physical and electronic surveillance and interviews which led to the cash seizures pointed to an individual (Individual #1)[1] believed to be a participant and leader in a drug organization. The investigation revealed that Individual #1 was attempting to launder the money seized to the Mexican cartels. Individual #1 had recently been released from Federal custody for a narcotics related conviction. Anderson was named as a member of Individual #1's drug trafficking organization (DTO). (Gov't Ex. 1, at 2). In August 2022, 9 months after the cash recoveries, a suspect involved in this fall 2021 investigation told investigators that Anderson was still involved with Individual #1's DTO and dealing narcotics. (*Id.* at 3).

On December 13, 2021, investigators observed the GMC Truck with license plate no. TK345OAE pull into 3121 Edgerton Street ("Edgerton Street address"). Anderson was identified as the driver and registered own of that GMC truck. On January 20, 2022, the same GMC Truck was parked in the driveway of the Edgerton Street address. Anderson is seen jogging from the front door of the residence to the truck with one hand partially concealed under his shirt or "held closely to his mid-section." Anderson entered the truck. Individual #1 was observed standing in the doorway of the Edgerton Street address.

In April 2022, TFO Compton and others interviewed a confidential human source (CI #1). CI #1 had been arrested for narcotics violations before and was known to provide credible

---

[1] Individual #1 is specifically identified in the unredacted affidavit which the Government filed under seal. For now, the identity of Individual #1 is not necessary to the issues raised in the motions.

3

information in other investigations. This CI's information has led to multiple arrests and their information has been used in court documents such as search warrants. (Gov't Ex. 1, at 2). CI #1 told investigators that CI #1 purchases narcotics from Anderson, that Anderson lives at the Bridgeway Apt., drives a white truck, and charges $30,000 for a kilogram of cocaine, $2,000 for 50 grams of fentanyl, and $900-$950 for an ounce of cocaine. CI #1 advised that Anderson is "always heavily armed" (Gov't Ex. 1, at 2). CI #1 also identified Individual #1 as Anderson's narcotics supplier.

Investigators interviewed a second confidential human source (CI #2) in September 2022. CI #2 had been arrested for narcotics violations in the past, had been a federal confidential informant, and had provided credible information leading to two previous arrests. (Gov't Ex, 1, at 2). CI #2 stated that Anderson was dealing ounces of cocaine out of his apartment in Lakeshore Apartments. TFO Compton added to the affidavit that the Bridgeway Apt is located in the Lakeshore Apartment complex. (*Id.*).[2] CI #2 stated that Individual #1 was dealing narcotics with Anderson.

On October 11, 2022, task force officers along with the DEA, conducted surveillance at the Bridgeway Apt. They observed Anderson leave the entrance to the Bridgeway Apt. and drive away in the GMC Truck. Investigators followed Anderson to an address on Trace Way ("the Trace Way house") in Fort Wayne, IN. While Anderson was observed parked there, three more vehicles arrived, including a silver SUV which Individual #1 was known to use. Officers positively identified Individual #1 and his son. A black male exited from one of the vehicles and carried a bag into the Trace Way house. While this was ongoing, a male entered Anderson's vehicle on the passenger side and exited a few minutes later. Anderson then left the area driving the GMC Truck.

---

[2] This addition by TFO Compton turned out to be wrong as Anderson points out in his offer of proof.

(Gov't Ex. 1, at 3). Through his 22 years of experience in large scale narcotics related crimes, TFO Compton averred that illegal narcotics dealers commonly conduct a money drop at a residence where multiple people drop off money for previous drug debts or in anticipation of a new shipment of narcotics. (*Id.* at 3).

Surveillance followed Anderson in the GMC Truck from the Trace Way house and conducted a traffic stop. Anderson was talking on his cell phone when stopped. A K-9 officer used his certified narcotics detection canine to conduct an open air sniff on Anderson's vehicle. After the canine alerted, officers searched the vehicle. Officers located marijuana residue on the floor of the vehicle and in the cup holder. An empty blue duffle bag was located in the back seat. (Gov't Ex. 1, at 3).

During the traffic stop, surveillance was also taking place at the Trace Way house. Officers observed a male black exit a vehicle parked in the driveway of the Trace Way residence. This individual walked around the complete circular drive in the neighborhood. TFO Compton believes based on his training and experience that the individual was conducting counter-surveillance after Anderson called him telling him he had been stopped. (Gov't Ex. 1, at 3).

Based on this information, law enforcement sought and received a GPS tracking device to "track the location of the [GMC Truck] and where [Anderson] secures, buys, and/or stores Narcotics in Indiana, or out of state" (Gov't Ex. 1, at 4) for a period of 30 days. The affidavit was approved by an Allen County Deputy Prosecuting Attorney prior to its submission to the magistrate.

    **B. GPS Tracking Warrant 2 ("GPS 2")**

On November 10, 2022, TFO Compton obtained GPS 2 for the GMC Truck. The supporting affidavit (Gov't Ex. 2) included all the previously provided information and added the following information:

> On October 14, 2022, Magistrate Keirns with the Allen County Superior Court issued [GPS 1] for [the GMC Truck]. The tracker was deployed on the vehicle on October 17, 2022. During both physical and electronic surveillance on [Anderson] and his vehicle surveillance officers have observed Anderson making suspicious stop[s] in parking lots and meet with subjects for short periods of time. Through Det. Compton's training and experience it is common for drug dealers to meet their drug customers and/or their drug suppliers in parking lots or public places during short periods of time so those people do not know where they live to prevent their residence from being robbed of their drugs and money.
>
> On November 1, 2022, electronic surveillance indicated the [GMC Truck] drove to an apartment complex in Detroit[,] Michigan and stayed there for approximately 20 minutes then drove directly back to Indiana. Once in Indiana, Allen County Police Department Cpl. Ben Fries conducted a traffic stop on the [GMC Truck] for speeding on US 24 westbound from SR 101 in Allen County, Indiana. Kevin Menefee was driving and [] Anderson was [the passenger.]

(Gov't Ex. 2, at 4). When officers approached the vehicle, they smelled the odor of raw marijuana coming from inside the vehicle. (*Id.* at 5). Anderson exited the vehicle and Cpl. Fries located marijuana on his person. Menefee admitted that marijuana and money inside the vehicle (approximately $9,000.00) belonged to him. Both Menefee and Anderson were placed in protective custody inside a patrol car. Anderson refused to consent to a vehicle search. (*Id.*).

Cpl. Fries and his canine partner, Django, conducted a free-air sniff of the vehicle. Django alerted to the presence of drugs in the vehicle and officers located 12.7 grams of marijuana and $9,000.00 inside it. Menefee told officers that he and Anderson went to Ann Arbor, Michigan, to buy a Sprinter Van but once they arrived, he didn't buy it. This information conflicted with the geolocation data which showed the vehicle had gone to Detroit. Menefee and Anderson were transported to the Allen County Police Department, issued summons for possession of marijuana, and released. (Gov't Ex. 2, at 5).

Based on TFO Anderson's training and experience, he believed Anderson was continuing his criminal activity involving narcotics possession and trafficking. Like the warrant affidavit for GPS 1, the affidavit supporting issuance of GPS 2 was reviewed and signed by an Allen County Deputy Prosecuting Attorney. GPS 2 authorized the placement of the tracking device for an additional 30 days.

### C. GPS Tracking Warrant 3 ("GPS 3")

On December 9, 2022, TFO Compton obtained GPS 3 for the GMC Truck. The supporting affidavit (Gov't Ex. 3) included all the previously provided information and added the following information:

> On November 29, 2022 during surveillance of []Anderson while he was driving the [GMC Truck], he arrived at 1305 Normandale Drive, Fort Wayne, Indiana. During the period of time that Anderson was there a male white subject showed up to the residence for a few minutes then exited the residence carrying something in his hand. Once the male white left the meeting where Anderson's truck was parked, the male white drove to the gas station around the corner at 901 West Coliseum Blvd and picked up a tall white male that was sitting on the curb. The male sitting on the curb appeared to have been dropped off there while the white male went to meet Anderson on Normandale Drive. Through my training and experience this is common for drug dealers to drop people off before meeting up with their supplier so the other person doesn't know where the drug supply is coming from. This is done for several reasons, one is to prevent the drug house from being burglarized or robbed, another is the fact the higher level drug dealers do not want to meet anyone new, and so the new person doesn't cut the mid-level drug dealer out by going to the drug source.
>
> Throughout October, November, and December 2022 and as recent as December 6, 2022,[]during both physical and electronic surveillance on Anderson, driving the [GMC Truck], it appears Anderson is using the residence at 1305 Normandale Drive, Fort Wayne, Indiana as a stash house to sell narcotics out of. Anderson goes to 1305 Normandale Drive multiple times a week and while he is there people come over and meet with him. These meetings are for short periods of time then they leave.

(Gov't Ex. 3, at 5). Through Det. Compton's training and experience, he believed that the activity observed was consistent with Anderson continuing to engage in criminal activity involving narcotics possession and trafficking. Based on his training and experience, Det. Compton

7

represented that it is common for drug dealers and their drug customers to meet for short periods of time to exchange the narcotics and money. (*Id.*).

As with the other two GPS warrant affidavits, this affidavit was reviewed and signed by a Deputy Allen County Prosecuting Attorney. GPS 3 authorized a continuation of the prior GPS warrants for another 30 days.

### D.  GPS Tracking Warrant 4 ("GPS 4")

On January 10, 2023, TFO Compton obtained GPS 4 for the GMC Truck. The supporting affidavit (Gov't Ex. 4) included all the previously provided information and added the following information:

> Investigators have also observed Anderson making multiple trips to the Orchard Place Apartments complex at 926 East Cook Road, Fort Wayne, Indiana where Anderson has made 11 stops from December 6, 2022 to January 2, 2023 with an average time of 12 minutes spent at the apartment then travels to 1305 Normandale Drive, Fort Wayne, Indiana, which is believed to be Anderson's stash house where he is selling narcotics out of. Through your Affiant's training and experience this activity indicative of picking up narcotics at one location then taking the narcotics to location to distribute them. [sic] This is a common practice of higher-level narcotics dealers.

(Gov't Ex. 4, at 5).

As with all the other GPS warrant affidavits, this affidavit was reviewed and signed by a Deputy Allen County Prosecuting Attorney. GPS 4 authorized a continuation of the prior GPS warrants for another 30 days.

### DISCUSSION

"There is ... a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. But a defendant may overcome this presumption if the defendant can prove a *Franks* violation occurred. *See United States v. Edwards*, 34 F.4th 570, 580 (7th Cir. 2022). A *Franks* violation is established "when the defendant shows by a preponderance of the evidence that (1) the affidavit in support of the warrant contains false statements or

8

misleading omissions, (2) the false statements or omissions were made deliberately or with reckless disregard for the truth, and (3) probable cause would not have existed without the false statements and/or omissions." *United States v. Williams*, 718 F.3d 644, 647-48 (7th Cir. 2013) (citing *Franks*, 438 U.S. at 155-56).

Ordinarily, a defendant is not entitled to an evidentiary hearing to challenge a facially valid search warrant. But the Supreme Court in *Franks* created a narrow exception to this rule. "A defendant is entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of information included in a search warrant application—if he can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause." *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016). That showing is not limited to false statements but applies to material omissions as well. *Id*. at 708. Merely to obtain a *Franks* hearing, however, a defendant need not prove the *Franks* violation. "Proof by a preponderance of the evidence is not required until the *Franks* hearing itself." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014). But a hearing is not mandated absent "allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. "Reckless disregard for the truth" means that "the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012).

When law enforcement officials submit a search warrant affidavit, it is presumed that the factual showing they make "will be a truthful showing." *Franks*, 438 U.S. at 164-65 (quotation, citation and emphasis omitted). As he did in the motion challenging the Bridgeway Apt. search

9

warrant, Anderson offers a thorough paragraph by paragraph response to the GPS search warrant affidavits outlining what he believes to be material misstatements or omissions in the affidavit that cast doubt on its veracity.

The Court assumes the parties' familiarity with its prior order addressing the Bridgeway Apt. search warrant wherein it detailed the offer of proof presented by Anderson to support his request for a *Franks* hearing for that warrant. (See Opinion and Order, ECF No. 64 at pp. 8-10). Anderson reasserts most of that offer of proof as part of the present attack on the GPS warrants. But just as was the case for the Bridgeway Apt. search warrant, the Court finds that while there may be omissions or mistakes in the affidavits supporting the GPS warrants, none of those omissions or mistakes were intentional nor were they material to the magistrates' issuance of any of the GPS warrants. As this Court noted in its prior order:

> A larger problem for Anderson is materiality. Even if the Court includes all of the omitted information and corrects any misstatements, the Court fails to see how probable cause would be defeated given the totality of the circumstances. CI #1, a known and proven CI, provided information that Anderson sold him drugs from the Bridgeway Apt., drove a white pickup truck, and provided information as to the sales price of the drugs Anderson offered. He also told investigators that Anderson is always heavily armed and Individual #1 was Anderson's supplier. Anderson contends that CI #1's statements are unreliable because the affidavit lacks details of how CI #1 obtained the information and, at least two times, Anderson was stopped by police and wasn't armed so Anderson asserts the information was inaccurate.
>
> When an informant's information serves as the basis for the probable cause determination, the probable cause determination turns on the informant's credibility. *Id.* "To evaluate an informant's credibility, [courts] consider 'the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate.'" *Glover,* 755 F.3d at 816. No one factor is determinative.
>
> Included in the affidavit was a statement that CI #1 had worked with law enforcement before and had proven reliable. While the Court agrees that CI #1's statement that Anderson was "always heavily armed" was never corroborated, nearly all the remaining information was. In fact, some of CI #1's information had

> already been corroborated by the investigation prior to his interview which gives his information *more* reliability, not less. According to the affidavit, investigators already knew Anderson drove a white pickup truck, that he was connected to the Bridgeway Apt. and that he had some association with Individual #1 (when he was seen leaving the Edgerton Street address while Individual #1 stood in the doorway). Post-interview, Anderson was seen exiting from the Bridgeway Apt. going to the Trace Way house and observed conducting what TFO Compton reasonably interpreted to be a money drop. So, again, surveillance confirmed Anderson was connected to the Bridgeway Apt. and corroborated CI #1's association between the Bridgeway Apt. and Anderson…
>
> …. All told, the Court does not find that the affidavit contained deliberate falsehoods or that it omitted facts with a reckless disregard for the truth. The facts in the affidavit demonstrated Anderson's ongoing drug trafficking through the information obtained from the CIs, and the many inferences drawn by experienced officers from the surveillance, both physical and electronic, of Anderson's comings and goings – all of which signaled that he was part of drug trafficking activities. The high standard necessary under *Franks* to warrant a hearing has simply not been met here. Not only are the alleged misstatements and omissions immaterial to the probable cause finding, but Anderson has not shown that they were intentional or reckless. "[I]t is one thing to say that an affiant falsely or recklessly stated facts from which he thereafter drew conclusions. It is quite another thing to say that the conclusions drawn from the facts fairly stated were falsely and recklessly made." *United States v. Jimenez*, 824 F. Supp. 351, 361 (S.D.N.Y. 1993) (quoting *United States v. Gotti*, 771 F. Supp. 535, 539 (E.D.N.Y. 1991)). As far as the Court can tell, the latter explanation applies here. Anderson has not offered direct or circumstantial evidence of TFO Compton's intent or shown that the conclusions he drew from the fairly stated facts were improper. Without it, the Court cannot authorize a *Franks* hearing. Anderson's Motion for a *Franks* Hearing is DENIED.

(ECF No. 64, at 13-16).

So, too, with respect to GPS 1 through GPS 4, all of which contained mostly the same information set forth in the Bridgeway Apt. affidavit, the Court concludes that Defendant's offer of proof fails to make the substantial preliminary showing of the existence of material omissions or intentional misrepresentations that would implicate the probable cause analysis for issuance of the tracking warrants.

Defendant does offer several additions to his offer of proof that were not presented in relation to the Bridgeway Apt. affidavit. First, Defendant provides a recorded interview (ECF No.

11

118, Dfdt's Ex. W) of Menefee who was driving the GMC Truck when it was stopped by police on November 1, 2022. Anderson asserts this interview establishes that TFO Compton falsely stated in the affidavits for GPS 2, 3, and 4 that the GPS tracking data showed Anderson went to Detroit. In the interview, Anderson represents that Menefee "showed the officers his communications with a person about the purchase of a Sprint [sic] Van" and "showed them his Google Maps that verified exactly where he went in Michigan." (ECF No. 115 at 12). In his prior proffer for the Bridgeway Apt. Anderson included the latitude and longitude coordinates for the GPS tracker on November 1, 2022, which showed the GMC Truck in a city between Ann Arbor and Detroit. Thus, Anderson takes issue with the statement in the affidavits that GPS tracking showed the GMC Truck was in Detroit.

The second new piece of information Anderson proffers is an email from TFO Compton dated April 15, 2022, that states "[o]ur CI owes him 13k." (ECF No. 117, Ex. X). According to Anderson, this shows that one of the CI's had a significant debt owed to Anderson and this information was not disclosed in the affidavits. Anderson also points to part of its prior proffer which included a DEA Report of Investigation that reported that on April 4 or April 5, 2022, Anderson threatened the CI because the CI owed Anderson $13,000 for an old drug debt. (ECF No. 47 at 47).

Neither of these pieces of additional information proffered by Anderson moves the needle in his favor. The exact location of the GMC Truck on November 1, 2022, is not the pertinent information in the affidavits. As the Government points out it was the fact that the general location was in between Ann Arbor and Detroit and the vehicle traveled to that area and stopped for only 20 minutes before returning to Fort Wayne. Based on TFO Compton's training and experience it

was the out of state travel with only a 20-minute stay before returning to Fort Wayne that was indicative of narcotics trafficking.

As for the email showing that one of the CI's (presumably CI #1) owed a debt to Anderson and the knowledge that Anderson had threatened the CI, this might have been helpful information if the CI's involvement was the sole evidence presented to the magistrate to establish probable cause. But here, the investigation began in July 2021 – long before CI #1's information appeared in an affidavit. Based on information obtained prior to the CI's involvement, authorities were already investigating Anderson and the Bridgeway Apt and the GMC Truck were already on the radar. So when the magistrate was presented with CI #1's information, the CI corroborated this previously known information. This corroboration of already known information demonstrated to the magistrate at least a basic level of credibility for the CI. And the magistrate was told that the CI had been arrested for narcotics violations in the past but has been utilized in the past and proven reliable. The CI's information had been used to obtain warrants and had led to arrests in other cases. Further, this CI knew specific pricing details dependent on drug type that Anderson charged. He charged $30,000 for a kilo of cocaine, $2,000 for 50 grams of fentanyl and $900-$950 for an ounce of cocaine.

Anderson makes much of the fact that CI #1 was allegedly threatened by Anderson in relation to the $13,000 drug debt and that is crucial information of the CI's motive and credibility that should have been provided to the magistrate. Given the circumstances here, the Court simply can't agree. Magistrates are allowed to make reasonable inferences from the information presented in the affidavit. Here, a magistrate could certainly infer that an individual purchasing large amounts of narcotics might be fronted those drugs by their supplier until they unload them to their customer base. So too, magistrates often are aware that many confidential informants are criminals

13

themselves, owe debts, have biases or axes to grind with individuals which influence their decisions to assist police. *See United States v. Veloz*, 948 F.3d 418, 428 (1st Cir. 2020) ("[M]agistrate judges ... often know, even without an explicit discussion of criminal history, that many confidential informants 'suffer from generally unsavory character' and may only be assisting police to avoid prosecution for their own crimes."). Thus, the existence of a debt alone, does not further Anderson's cause.

This Court has also previously found that the information from the multiple CIs in the investigation was heavily corroborated by independent surveillance and other means:

> Included in the affidavit was a statement that CI #1 had worked with law enforcement before and had proven reliable. While the Court agrees that CI #1's statement that Anderson was "always heavily armed" was never corroborated, nearly all the remaining information was. In fact, some of CI #1's information had already been corroborated by the investigation prior to his interview which gives his information *more* reliability, not less. According to the affidavit, investigators already knew Anderson drove a white pickup truck, that he was connected to the Bridgeway Apt. and that he had some association with Individual #1 (when he was seen leaving the Edgerton Street address while Individual #1 stood in the doorway). Post-interview, Anderson was seen exiting from the Bridgeway Apt. going to the Trace Way house and observed conducting what TFO Compton reasonably interpreted to be a money drop. So, again, surveillance confirmed Anderson was connected to the Bridgeway Apt. and corroborated CI #1's association between the Bridgeway Apt. and Anderson.
>
> If that were not enough, the three CI's, although interviewed at different times, corroborated each other (for the most part) as well as other facts from the investigation. CI #2, another experienced informant with prior reliability, told investigators that Anderson was dealing cocaine out of his apartment and was involved with Individual #1. CI #3 told investigators that he had been buying cocaine from Anderson at the Bridgeway Apt. in the South Bridge Apartments. Nothing Anderson proffers changes the fact that three individuals connected Anderson with drug trafficking activity and with the Bridgeway Apt.

(ECF No. 64, at 14-15)[3].

---

[3] CI #3's information was not included in any of the GPS warrant affidavits but it was included in the search warrant for the Bridgeway Apt. However, the discussion from this Court's prior order is relevant for its discussion of CI #1 and CI #2 which this Court found heavily corroborated by other aspects of the investigation.

In sum, the Court concludes that the additional offers of proof, even when combined with the previously submitted offer of proof, fails to make the substantial preliminary showing required by *Franks*. While Anderson dances around the facts in the affidavits and does show some omissions and mistakes, none of those omissions were material to the probable cause determination and there has been no preliminary showing of an intent by TFO Compton to mislead the magistrate by picking and choosing the information provided. For this reason, the Court DENIES the Consolidated Request for a *Franks* Hearing as to any of the GPS warrants.

Moreover, the Court finds that each of the supporting affidavits for GPS 1 through 4 establish probable cause because they showed there was a fair probability that evidence of drug trafficking would likely be found through a particular means –on a GPS tracking device. For these reasons, the Court DENIES the Consolidated Motion to Suppress.

## **CONCLUSION**

Both the Defendant's Consolidated request for a *Franks* hearing (ECF No. 115) and the Motion to Suppress (ECF No. 114) are DENIED. The Court also REAFFIRMS all prior rulings with respect to the motions to suppress and the request for a *Franks* hearing. A scheduling order will issue by separate entry.

SO ORDERED on March 11, 2025.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT JUDGE