UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CASE NO. 1:23-CR-09-HAB-ALT |
| KELTON D ANDERSON | |

## OPINION AND ORDER

Defendant Kelton Anderson, proceeding as his own counsel, moved to suppress DNA evidence or alternatively, for a Rule 702/*Daubert* hearing. (ECF No. 189). The Court denied the motion to suppress DNA evidence and took under advisement the alternative request for a *Daubert* hearing pending additional briefing. (ECF No. 210). The Government filed its brief as directed. (ECF No. 212). Defendant did not reply despite being given ample time to do so. For the reasons below, the Motion for a Rule 702/*Daubert* hearing is DENIED and the Court finds that the DNA evidence and the expert's proposed testimony meets the criteria for admission under Rule 702.

## DISCUSSION

a. **Factual Background**

The parties are intimately familiar with the facts here, which have been oft repeated in the extensive pretrial litigation that has ensued since Defendant's arrest in February 2023. As it relates to the DNA evidence, the Court previously outlined in general terms the DNA evidence that the Government intends to offer at trial. Pursuant to a lawful warrant,[1] a buccal swab was collected from the Defendant and tested with DNA swabs collected from two firearms: a Glock 45 pistol,

---

[1] This Court previously found that the warrant obtained for the buccal swab was supported by probable cause and lawful. (ECF No. 210).

serial #AFN816 and a Sphinx SDP compact pistol, serial #513800581. In response to this Court's order directing further briefing, the Government has proffered the Certificate of Analysis from the Indiana State Police ("ISP") laboratory (ECF No. 212-1) as well as the qualification of its forensics experts involved with the testing of the DNA swabs, Serafina Salamo ("Salamo") and Susan D. Laine ("Laine") (ECF Nos. 212-2 through 212-3). According to the Government, it plans to have Salamo designated as an expert in DNA analysis at trial. The Government has not stated its intention related to Laine.

In short, the findings in the Certificate of Analysis determined that the DNA profile from the combined swabs was interpreted to be a mixture of four individuals. That profile is "at least 1 trillion times more likely if it originated from Kelton Anderson and three unknown individuals than if it originated from four unknown unrelated individuals. (ECF No. 212-1, at 2). Defendant was considered a contributor to the DNA profile and the "statistical analysis provides very strong support for the proposition that Kelton Anderson is included." (*Id.*). Salamo is the signatory to the Certificate of Analysis.

On March 26, 2025, Task Force Officer Darren Compton ("TFO Compton") collected the buccal swabs from Defendant and they were placed into evidence as Allen County Police Department ("ACPD") Item #570. On March 27, 2025, TFO Compton took custody of the swabs from the two firearms. The swabs from the Glock were item #571 and the swabs from the Sphinx were item #572. These items were then transferred to the ISP Lab on April 3, 2025.

The buccal swabs from Defendant were assigned ISP Lab Evidence #006, the Glock swabs were assigned ISP Lab Evidence #007, and the Sphinx swabs were assigned ISP Lab Evidence #008. Salamo, a forensic scientist from the biology unit of the ISP analyzed Items 006, 007, and

2

008 between April 7, 2025 and April 25, 2025 which yielded the Certificate of Analysis, ECF No. 212-1. On April 29, 2025, the tested items were returned to the custody of the ACPD.

The Government's brief summarized the process and methodology used by Salamo at the ISP Laboratory, relevant portions of which are excerpted below:

> The ISP Lab is accredited by the ANSI National Accreditation Board (ANAB) to ISO/IEC 17025 for forensic testing. [ECF No. 212-1 at 1]. The Indiana State Police Forensic Services Division has provided accredited services since 1991. (Id.). According to ANAB's website, "[t]he goal of ANAB laboratory accreditation program is to provide 3rd party assurance of the quality of laboratories with the objective of promoting confidence in laboratory activities through accreditation by assuring compliance with international standards, ISO/IEC 17025 and ISO 15189."[2] ANAB, Laboratory Accreditations, ANAB ANSI NATIONAL ACCREDITATION BOARD, https://anab.ansi.org/accreds/laboratory/ (last visited Dec. 9, 2025). To ensure quality assurance, the laboratory division maintains a Quality Assurance Manual and each case is technically reviewed by another qualified analyst. The purpose of the technical review is to ensure the other analyst agreed with the findings before the case can be released. The procedures and protocols for quality assurance and DNA analysis are standardized throughout the laboratory.
>
> Generally, when a request for analysis is made the requesting agency will fill out paperwork that lists the items of evidence that are being submitted and what the request is for testing. When those items arrive at the laboratory, they get a unique case number, and each item gets a unique identifying number internal to the ISP Lab. The ISP Lab is a secure facility, and the evidence clerk stores the items in a secure vault until requested by an analyst. Those items submitted to the laboratory arrive in a sealed condition. Forensic scientists wear personal protective equipment to ensure they are not depositing their own DNA on items. Forensic scientists only have one item of evidence open at any time and thoroughly clean their workspace between each item of evidence. These protocols were followed in [] Salamo's examination of Items 006, 007, and 008.
>
> For DNA analysis, the first step is extraction which is the process of breaking open the cells. The second step is referred to as quantification, which identifies how much DNA the forensic scientist got from the extraction. In this case examination, Item 007 did not have enough DNA to proceed in the analysis. This was reported by [] Salamo as "the combined swabs demonstrated an insufficient quantity of DNA for further analysis." [ECF No. 212-1, at 1]. Item 008 demonstrated a sufficient amount of DNA to proceed to the next step.
>
> The third step, referred to as PCR (Polymerase Chain Reaction) or amplification, is the process of amplifying the sample into millions of copies. Once

3

> a DNA sample is amplified, it is placed on an instrument that will separate out the DNA fragments by size, making it possible to visualize the DNA profile in a way conducive to data interpretation. The last stage of the DNA analysis is referred to as interpretation which is where the forensic scientist draws his/her conclusions.
>
> If there is a sufficient quantity and quality in the profile for an analyst to be confident in the number of contributors, then they will use a tool called STRmix to assist in the further interpretation and statistical calculations of the DNA profile. For Item 008, [] Salamo drew the conclusion that the DNA profile was a mixture of four individuals and utilized STRmix for further assistance in the interpretation when comparing to Item 006, Anderson's DNA standard. According for the case file, Contributor 1 accounted for 77.8% of the DNA profile, Contributor 2 accounted for 10.3% of the DNA profile, Contributor 3 accounted for 7.4% of the DNA profile, and Contributor 4 accounted for 4.5% of the DNA profile. Anderson is consistent with being Contributor 1. Contributors 3 and 4 were not suitable for comparison.
>
> When comparing the entire DNA profile from Item 008 to the known standard from Anderson, [] Salamo entered two contributor propositions into STRmix: (1) that the DNA profile originated from Anderson and three unknown individuals, and (2) that the DNA profile originated from four unknown, unrelated individuals. STRmix concluded the evidence is 5.2 octillion times more likely if it originated from Kelton Anderson and three unknown individuals than if it originated from four unknown, unrelated individuals. The ISP Lab cuts off reporting likelihood ratios on laboratory examination reports at 1 trillion. [ECF No. 212, at 3].
>
> This case was technically reviewed by Forensic Scientist Susan Laine (Forensic Scientist Laine) who has been a Forensic Scientist at the ISP Lab since 1994…

(Gov't Brief, ECF No. 212 at 8-11).

Further on in the brief, after first noting that the inculpatory portion of Salamo's opinion involves a DNA mixture of four individuals, the Government described Salamo's use of STRmix:

> STRmix is expert forensic software that can interpret complex DNA results. The software was developmentally validated prior to it process and procedures being used in labs like the ISP Lab and FBI Laboratory. STRmix was validated according to the Scientific Working Group on DNA Analysis Methods (SWGDAM) Guidelines for the Validation of Probabilistic Genotyping Systems. The Indiana State Police began using STRmix in its laboratory in late 2017. []Salamo was a member of the internal validation team from 2016 to 2020. This internal validation helped develop the standard operating procedures and training manuals in the ISP Lab as to its use. In 2018, a group of thirty-one laboratories published a compilation

4

> of the internal validations of STRmix from 2,825 mixtures comprising three to six donors. The article was entitled Internal Validation of STRmix – A multi laboratory response to PCAST, and it was published in the Forensic Science International: Genetics…
>
> STRmix has been peer reviewed, and it has been the subject of many published peer reviewed articles… "[M]ore than 50 published peer-reviewed articles ha[ve] addressed STRmix. According to one expert, STRmix is the 'most tested and most . . . peer reviewed' probabilistic genotyping software available." *United States v. Gissantaner,* 990 F.3d 457, 465 (6th Cir. 2021).
>
> The error rate in four-contributor DNA mixtures has been tested and published in the Forensic Science International. STRmix was evaluated using 300,000 non-contributor profiles compared to four-contributor DNA mixtures. Based on the analysis of the 300,000 profiles that were known not to be in a mixture, the study concluded that STRmix accurately excluded the non-contributors 99.1% of the time. Most of the false inclusions were associated with low likelihood ratios. Noel, S. et al., *STRmix put to the test: 300,000 non-contributor profiles compared to four-contributor DNA mixtures and the impact of replicates*, Forensic Science Int'l: Genetics 41 (2019), at 24-31. The ISP Lab is on a four-year reassessment accreditation cycle with ANAB and performs yearly internal audits. Additionally, technical review, like the one performed for Forensic Scientist Laine, helps ensure quality assurance standards are met to mitigate error rates.

(*Id.* at 16-19).

### b. *Daubert* Standard

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589. Rule 702 gives district courts "broad latitude" to structure proceedings concerning expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). The district court's gatekeeping can be performed through numerous procedures – such as motion in limine briefing and oral argument, voir dire, and cross-examination at trial. *See, e.g.*, *United States v. Calderon-Segura,* 512 F.3d 1104, 1108-10 (9th Cir. 2008) (*quoting Kumho,* 526 U.S. at 152, and noting that

5

wide latitude is afforded judges to determine the process to assess the reliability of expert testimony). The Court may, but need not, conduct a *Daubert* hearing. *See Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) ("[A] *Daubert* hearing is [not] always required."); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) (no automatic entitlement to a *Daubert* hearing because the Seventh Circuit has "not required that the *Daubert* inquiry take any specific form").

Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following conditions are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the key to the gate is not the ultimate correctness of the expert's conclusions ..., it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). In evaluating the expert's proposed testimony, the Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (internal quotation marks omitted).

   c. **Application**

The basis of the Defendant's original motion challenging the admissibility of the DNA evidence is unclear. That motion asks for limits and instructions on the proposed DNA evidence and for a "pretrial Rule 104(a) hearing to ensure Rule 702 is satisfied as applied." (ECF No. 189

at 6). But despite the additional briefing ordered by the Court, Defendant has offered no evidence, no argument, and no brief challenging the qualifications of the Government's proposed expert nor the reliability of the methodology applied. At most, Defendant's initial brief made sweeping references to the software used and the "transfer risk," "mixture ambiguity" and "why sub-source inclusion does not answer activity-level questions" – all without any elaboration or specificity. Although the Court was hopeful the Defendant's final brief would clarify the matter, the failure of the Defendant to elaborate leaves the Court at a complete loss as to the basis of his challenge.

With that said, the Court has reviewed the Government's brief, arguments, and exhibits and finds it satisfies the Government's burden under *Daubert* and Rule 702. Accordingly, based on the representations from Government in its brief, the Court finds as follows:

1. Salamo is qualified to testify as an expert on DNA Analysis and STRmix based on her qualifications set forth in the Government's brief which included her education, training, and experience. These qualifications exceed the common knowledge of the average lay person and her testimony would assist the jury in assessing the evidence at trial. The Court incorporates by reference pages 5 – 7 of the Government's brief that sets forth Salamo's qualifications as well as ECF No. 212-2.

2. Salamo used PCR testing to create the DNA profiles which were analyzed and profiled. Courts have recognized that this process has been widely accepted for decades in the forensics community. *See e.g., United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996)("[T]he reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts of this circuit to take judicial notice of it in future cases."); *United States v. Wright,* 215 F.3d 1020, 1027 (9th Cir. 2000); *United States v. Shea,* 159 F.3d 37, 41 (1st Cir. 1998); George Bundy Smith & Janet A. Gordon, *The Admission of DNA Evidence in State and Federal Courts,* 65 Fordham L.Rev. 2465, 2470 (1997) (noting that PCR analysis "has received overwhelming acceptance in the scientific community and the courts.").

3. STRmix is expert forensic software that can interpret complex DNA results. The Indiana State Police began using STRmix in its laboratory in late 2017. STRmix is a highly respected and reliable scientific methodology for DNA analysis. *See United States v. Christensen,* 2019 WL 651500, at *2 (C.D. Ill. Feb. 15, 2019)("The evidence shows that STRmix has been repeatedly tested and widely accepted by the scientific community."). It has been peer-reviewed and is the subject of many published peer reviewed articles. The software was developmentally validated prior to being used in labs like the ISP Lab and FBI Laboratory. STRmix was validated according to the

    Scientific Working Group on DNA Analysis Methods (SWGDAM) Guidelines for the Validation of Probabilistic Genotyping ("PG") Systems.

    "The general acceptance of PG software to calculate likelihood ratios when a laboratory has properly validated it for use includes, but is not limited to, STRmix itself." *United States v. Johnston*, 2025 WL 964073, at *23 (E.D.N.Y. Mar. 30, 2025); *see, e.g. United States v. Green*, 2024 WL 4488577 (2d Cir. Oct. 15, 2024) (summary order) (finding no error in a district court's decision to admit STRmix evidence without holding a *Daubert hearing* as it "is widely used in forensic laboratories across the country") (internal quotation marks omitted); *United States v. Tucker*, 2020 WL 93951, at *4 (E.D.N.Y. Jan. 8, 2020) (noting that "[c]ourts have overwhelmingly admitted expert testimony based on STRmix results" and collecting cases).

    Based on the explanations provided in the Government's brief, the Court finds that the Government has met its threshold burden under *Daubert* that Salamo reliably applied STRmix to the relevant DNA samples in the case.

4. In making these threshold findings that Salamo's testimony is permissible under Rule 702, the Court makes no determination of the accuracy or weight of her opinions. If the Defendant wishes to challenge the accuracy or weight of the opinions at trial through cross-examination or otherwise, Defendant may do so.

5. An evidentiary hearing was not required for the Court to exercise its gatekeeping function because the parties had the opportunity to submit briefing and the Government submitted a thorough brief that went unrebutted by the Defendant.[2] *See Niam*, 354 F.3d at 660 ("[A] *Daubert* hearing is [not] always required."); *Kirstein*, 159 F.3d at 1067 (no automatic entitlement to a *Daubert* hearing because the Seventh Circuit has "not required that the *Daubert* inquiry take any specific form").

6. Although the Government submitted qualifications for Laine, who reviewed Salamo's findings ( ECF No 212-3), it has not stated its intention to have her designated as an expert at trial. The Court will address whether to qualify Laine as an expert at trial, if the need arises.

## **CONCLUSION**

In sum, the Defendant's request for a hearing under Fed. R. Evid. 104(a) to establish the reliability of expert testimony under *Daubert* and Fed. R. Evid. 702 (ECF No. 189) is DENIED.

---

[2] Because the Defendant is self-represented and has been instructed that he must mail his own filings to the Court, the Court waited before issuing the present Opinion and Order to account for the possibility that his filing was delayed due to the holidays or conditions at his pretrial place of incarceration.

Further, the Court finds the Government has met its burden of reliability under Rule 702 and will be allowed to proffer its DNA analyst. All pending pretrial motions have been resolved except for the Defendant's Motion in Limine (ECF No. 190). The case will be set for trial by separate entry and the Court will address the Defendant's Motion in Limine in the normal course of trial-related settings.

    **SO ORDERED** this 30th day of December 2025.

                                          s/Holly A. Brady
                                          CHIEF JUDGE HOLLY A. BRADY
                                          UNITED STATES DISTRICT COURT